# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VICTORIA EVANOFF, as Administrator ) NO. 5:23-cv-03417-JFL
of the ESTATE OF JOHN EVANOFF,     )
DECEASED                           )
                                   )
     - vs -                        )
                                   )
MARSH USA, LLC,                    )
THERESE PERRETTE, and              )
JOHN DOE DEFENDANTS # 1-2          )
- - - - - - - - - - - - - - - - - -

         REMOTE DEPOSITION OF VICTORIA EVANOFF, held via Zoom, taken by and before KRISTIN N. McCUSKER, Registered Merit Reporter, Certified Realtime Reporter and Notary Public, on Tuesday, January 23, 2024, commencing at 10:05 a.m.

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



A P P E A R A N C E S: (Zoom)

ANAPOL WEISS
BY: GABRIELLE I. WEISS, ESQUIRE
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, Pennsylvania 19103

Counsel for the Plaintiffs

GOLDBERG SEGALLA, LLP
BY: MICHAEL LUONGO, ESQUIRE
1700 Market Street, Suite 1418
Philadelphia, Pennsylvania 19103
Counsel for the Defendants

I N D E X

| WITNESS | PAGE |
| --- | --- |
| VICTORIA EVANOFF | |
| By: Mr. Luongo | 4, 63 |
| By: Ms. Weiss | 62 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE MARKED |
| --- | --- | --- |
| Evanoff-1 | Agreement For Compensation For Death | 64 |
| Evanoff-2 | GoFundMe Page | 64 |

(By agreement of counsel, the sealing, filing, and certification are waived; and all objections, except as to the form of the question, are reserved until the time of trial.)

VICTORIA EVANOFF, after having been duly sworn, was examined and testified as follows:

BY MR. LUONGO:
Q. Good morning, Ms. Evanoff. My name is Michael Luongo. I'm with the law firm of Goldberg Segalla, and I represent Defendants, Marsh USA and Therese Perrette in this action.
First, we'll take breaks as needed. So if you need to stop at any time, just let me know and we'll try to accommodate that.
Where are you currently located for this deposition?
A. Like what room in my home?

Q. Well, you said your home. So that's what I'm trying to get at. Are you at your home right now?
A. Yes.
Q. Is there anyone else present with you?
A. I'm by myself.
Q. You're testifying under oath today. Do you understand that your testimony has the same effect as if we were in court?
A. Yes.
Q. I have a few instructions for you. Please allow me to finish my question before you begin your answer even if you know where I'm going with my question. That way it makes it easy for the court reporter to transcribe everything that we're saying. It becomes difficult if we're talking over one another. Is that understood?
A. Yes.
Q. Also please make sure to give me verbal responses. Gestures won't come through in a written transcript. Okay?



A. Yes.
Q. Also you are not required to guess or speculate at an answer. So if you don't know something, just let me know that. But if you are able to estimate, you can tell me that you are giving me an estimate. Understood?
A. Yes.
Q. If you don't understand any of my questions, please let me know. I will try to rephrase. But if you do respond to my question, I will assume that you understood it and are giving me your best answer. Okay?
A. Yes.
Q. Are you taking any medications that would affect your ability to testify today?
A. No.
Q. Can you please state your full name for the record?
A. Victoria Lei Evanoff.
Q. And your middle name, is that spelled L-E-I?
A. Yes.

Q. What is your date of birth?
A. [redacted] 1993.
Q. Do you have an e-mail address?
A. Yes.
Q. What e-mail address or addresses do you currently use?
A. The only one that I access is v.evanoff93@gmail.com.
Q. My next question, I'm going to ask it on the record and then we can go off the record when you give me your response. So I'm going to ask for your Social Security number. And we can go off the record and you can tell me that. Okay?
Agree to go off the record, Gabrielle?
MS. WEISS: Yes.
BY MR. LUONGO:
Q. So the Social?
A. (Social Security was given at this time.)
Q. Do you have a home telephone number or just a cell?
A. I do. I don't know what it is. I

don't even have a phone hooked up to it.
Q. Okay. But you have a cell phone?
A. Yes.
Q. And what is your cell phone number?
A. (484) 338-3361.
Q. Is your current home address 236 East Elm Street, Reading, PA 19607?
A. Yes. Except not -- I don't use Reading. I use Shillington, because there is an Elm Street in the City of Reading, and Shillington is a borough.
Q. Okay. Just to make sure that we have it accurate on the transcript, can you state your current address?
A. 236 East Elm Street, Shillington, Pennsylvania 19607.
Q. How long have you lived at that address?
A. Since 2021.
Q. Does October of 2021 sound right to you?
A. 2022, actually. I believe I was incorrect about '21. I don't know. I can't remember which year it was.

Q. Some time between 2021 and 2022?
A. Yeah. It was -- it was 2022. Yes, for sure.
Q. Is that a house or an apartment?
A. Yeah, it's a house.
Q. Do you own that property or rent?
A. Own.
Q. Where did you live prior to moving to your current location?
A. I lived at my father's house for a short amount of time.
Q. What was the address of that location?
A. 3313 Fairfield Street, Laureldale, Pennsylvania 19605.
Q. Did you previously have an address at 117 Colonial Drive?
A. Yes. That's where my last address with John was located.
Q. And you are referring to John Evanoff, correct?
A. Yes.
Q. So give me the full address for that property.



Page 10

A. That was 117 A Colonial Drive, Shillington, Pennsylvania 19607.
Q. Was that an apartment?
A. Yes.
Q. And you rented that apartment?
A. He -- it was in his name. But, yes.
Q. An apartment rented in John Evanoff's name, correct?
A. Yes. I was the resident. He was the leaseholder.
Q. Okay. And how long did you live at that location?
A. Approximately two years, I believe.
Q. And do you recall when you moved from that property to 3313 Fairfield Street?
A. I don't remember the exact month. I believe it was April of 2021.
Q. And if you were there for two years, does that mean that you would have moved in sometime in 2019?
A. Yes.
Q. At your current location at 236 East Elm Street, who else lives at that address?

Page 11

A. My elderly father lives with myself and my two children, as well as my daughter's father temporarily.
Q. Has your mother passed away?
A. Yes.
Q. The address that you mentioned, 3313 Fairfield Street, that was a property that your father owned?
A. Yes.
Q. And did he sell that property?
A. Yes.
Q. Are you the sole owner of your house or do others have an ownership interest in the house?
A. My daughter's father has ownership interest in the house.
Q. What is your daughter's father's name?
A. Andrew L. Deblasi.
Q. What is your relationship to him?
A. We are not together.
Q. Did you say that he currently lives in your house?
A. He does.

Page 12

Q. So what do you mean by, "we are not together"?
A. We are not -- we are not seeing each other. We just live together as roommates and co-parents.
Q. When did you meet Mr. Deblasi?
A. We are childhood friends.
Q. What is your daughter's name?
A. I[redacted].
Q. How old is your daughter?
A. She is going to be 2 on [redacted].
Q. Did you at some time form a relationship with Mr. Deblasi after March of 2021?
A. Yes.
Q. And how long were you in a relationship with Mr. Deblasi?
A. From June of 2021 until December of 2022.
Q. Are you in a relationship with anyone else currently?
A. No.
Q. Do you have any plans to move in the

Page 13

next year?
A. No.
Q. You also stated that your son lives at your current residence, correct?
A. Yes.
Q. And that is G[redacted]?
A. Yes.
Q. And G[redacted] is the son of you and John Evanoff, correct?
A. Yes.
Q. When was G[redacted] born?
A. G[redacted] was born [redacted] 2015.
Q. When did you meet John Evanoff?
A. We were high school sweethearts. So I believe I was 16. I'm not sure what year that was. I want to say 2010. Yes, because it was a month after my mom passed. Yeah, 2010.
Q. You were about 16 or 17 at that time?
A. Yes. I was going to be 17 shortly after John and I started dating, which was in July of 2010. I turned 17 that August.
Q. And you were married on July 14,

MAGNA LEGAL SERVICES



2012?
A. Yes.
Q. What is your highest level of education?
A. Some college at community college.
Q. Where did you attend high school?
A. Muhlenberg High School.
Q. Did John Evanoff also graduate from Muhlenberg High School?
A. Yes. He was two grades above me. So he graduated in 2009.
Q. And you graduated in 2011?
A. I was meant to. I graduated in 2012.
Q. How many years or semesters did you attend community college?
A. Four semesters. So two years.
Q. And in what years did you attend community college?
A. That would have been -- I took a year off after I graduated high school, and then I did the two years. So 2013 to 2015, I believe that would have been.
Q. Did you have any other training or

education related to work or employment?
A. No.
Q. Are you currently employed?
A. No.
Q. Have you ever been employed?
A. Yes.
Q. What was your job and where were you employed?
A. My last job?
Q. We can work our way back. So we'll start with your last job.
A. My last job was at Merry Maids. I was just a regular maid.
Q. When did you have that job?
A. I don't remember when I started. I ended, or resigned, I should say, the week that the accident occurred.
Q. And are you referring to the March 6th, 2021, accident, involving John Evanoff?
A. Yes.
Q. So you have not been employed since March 2021?
A. No.

Q. And just to be clear for the transcript, when you say no, you are agreeing that you have not been employed since that date, right? I'm sorry. I didn't hear that.
A. Correct.
Q. Thank you. And prior to Merry Maids, what jobs did you hold?
A. Before Merry Maids, I worked at -- I'm trying to think in chronological order -- Supportive Concepts for Families, which is a nonprofit organization which takes care of mentally handicapped individuals. And then before that, I worked in a factory for a very short amount of time packing pretzels. I think that factory was called Savor Street Foods. Right before I worked there, I worked at -- I'm not certain if Zerbe Sisters Community Living, which is a nursing home, was before the factory or after the factory. I cannot remember. I do not recall. But I did work in another nursing home at some point. And I also worked at GameStop. And then my very first

job was in a nursing home in the kitchen. And that was called Rittenhouse Senior Living.
Q. Where was Rittenhouse Senior Living? What town?
A. When did I work there?
Q. No. I was asking what town it's located in.
A. Reading, I believe. It may be listed as Laureldale, even.
Q. Where were you born?
A. Reading, Pennsylvania, at the Reading Hospital.
Q. And have you lived in the Reading area your whole life?
A. Yes. I attended Muhlenberg School District my entire life. I lived in one house. My parents were always together.
Q. Is that one house the property you mentioned earlier that was, I believe, 3313?
A. Yes.
Q. Do you know what your salary or hourly wage was at Merry Maids?



Page 18

A. It was a sliding pay scale. So I started at $11 for the first month, but then it was based on how well you were cleaning, your ratings. So after the first month, I made $14 an hour until I stepped down to be part time. I do not recall when I stepped down to be part time.

John and I had plans for me to be a stay-at-home mom when he started working at Deka. So we wanted to test out if we could do it financially first. So then I stepped down to part time, and then I went back down to $11 an hour from $14. And then I stayed at the $11 an hour until I resigned.

Q. And you were working at Merry Maids from December through March -- December of 2020 through March of '21 when John was employed at Deka?

A. I believe so, yes.

Q. And Deka, that's another name for East Penn Manufacturing Company, correct?

A. Correct.

Q. John Evanoff started employment at East Penn Manufacturing Company in December

Page 19

of 2020, correct?

A. That sounds to be correct. I don't know for sure. But approximately, yes.

Q. What did he do for employment prior to working at East Penn?

A. He took care of mentally handicapped individuals. I know for a short amount of time, it was for a for-profit organization. I do not remember the name of that organization. I think he was only with that one for six months.

For, I want to say, maybe approximately four years before that, he worked for Supportive Concepts for Families, which is a nonprofit organization, as a community home supervisor taking care of mentally handicapped individuals.

Q. Did John Evanoff have any education beyond high school?

A. Yes. For a short amount of time, he went to Reading Area Community College, only a few semesters.

Q. You said, was it Reading Area

Page 20

Community College?

A. Yes.

Q. Is that the same community college that you attended?

A. Yes.

Q. Did you attend at the same time or at different times?

A. Different times.

Q. How did John Evanoff come to be employed at East Penn?

A. How did he hear about it?

Q. Yes.

A. Through a friend of ours. He just mentioned they were hiring. So John applied and interviewed with them and was hired.

Q. Is that friend someone that's employed at East Penn?

A. He's no longer employed at East Penn.

Q. Was he employed at the time?

A. Yes.

Q. What is his name or her name?

A. I do not recall. He wasn't my

Page 21

friend.

Q. What are your current daily activities?

A. As far as what do I do at home?

Q. You said that you are not currently employed. So what activities take up the majority of your day?

A. I'm a stay-at-home mom. I cook. I clean. I run errands, paying bills, grocery shopping, taking G[redacted] to and from school, doctor's appointments. Being a mom.

Q. Is your daughter attending any type of pre-school yet?

A. No. She's too little.

Q. Have your daily activities around the house changed at all between now and 2020?

A. As far as is it more difficult for myself?

Q. Well, the types of activities that you do, have they changed at all?

A. Yes. As far as I used to not have to take out the trash or carry the laundry



basket, things -- like the smaller things. I used to not have to pay the bills. But I didn't live in this home then, so it was a little bit different. There's much more responsibility in a home than there is in an apartment. So I have many more responsibilities now than I used to.
Q. Does Mr. Deblasi help at all with activities or household chores?
A. No.
Q. Is there a reason why not?
A. He's not here most of the time.
Q. Go ahead.
A. He just sleeps here, really.
Q. Do you have a mortgage on the house?
A. Yes.
Q. Does Mr. Deblasi pay towards the mortgage?
A. No.
Q. Is Mr. Deblasi working?
A. Yes.
Q. What does he do for employment?
A. I'm not certain of his job title. He works for Keurig Dr. Pepper.

Q. Who else did you say owns your house?
A. Just myself and Mr. Deblasi.
Q. So he's on the mortgage, but he's not paying towards the mortgage?
A. Correct. He has never paid towards the mortgage.
Q. Is that something you asked to do and he declined?
A. No. He most of the time has not lived here.
Q. Approximately how large was the apartment that you had with John Evanoff in 2020?
A. As far as square foot?
Q. Well, first just describe it generally. Was it a one-bedroom or a studio?
A. No. It was a two-bedroom apartment. It had a living room, a dining room, a kitchen, a hallway, two bedrooms, a full bathroom and a half bath.
Q. And do you know approximately what the square footage was?

A. I'm not certain, no.
Q. And what about the house that you are currently living in, how many bedrooms, bathrooms and size?
A. It's a four-bedroom, one and a half bath home. It has a living room, dining room, kitchen, mudroom. That's it. I don't know square footage.
Q. Does anyone else in your current residence assist with household chores?
A. No. My dad will sometimes do the dishes. He does his own laundry. But he doesn't help me with my children or anything like that. I do all the cooking, cleaning, all of those things. My father is elderly.
Q. Does your father make any financial contributions to you?
A. No.
Q. Is he receiving Social Security?
A. Yes. But he keeps that for himself.
Q. What are your current sources of income?
A. My current -- that would be I get

approximately $613 for workers' compensation from Sedgwick, and then I get Social Security, approximately $1,700 a month in Social Security, one of the checks, and then another one for $1,700. So $3,200 in Social Security and then $613 for workers' compensation.
Q. Do you know why you get two Social Security checks?
A. One of their survivor benefits. So one of them is until G[redacted] is until 16. He was 5 when the incident occurred. So one of them is more so because he was so young, I believe, so that one is for -- more for me. And then the other one is until he graduates -- until he's 18 or graduates high school.
Q. Are you saying that both of those Social Security checks are expected to end when G[redacted] is at age 16 and 18?
A. One of them ends when he is 16, one of them ends when he is 18. So I will not be receiving any Social Security at all by the age of 18, his age of 18.



Q. I'm going to switch topics slightly. Have you ever given a deposition before?
A. No. I've never done anything legal before.
Q. This action that brings us here today is the first lawsuit that you've been involved with. Is that correct?
A. As far as like getting in trouble and things like that?
Q. Well, either ones that you filed or ones that you've been named in. Have you been involved in any other lawsuit?
A. I'm not certain if it counts. Sedgwick was late paying my checks before, so I pursued something with that. But other than that, I've never had any kind of lawsuits other than this.
Q. And when you were referring to Sedgwick being late paying checks, are you referring to workers' compensation in connection with John Evanoff?
A. Yes. They were inconsistent.
Q. We'll get into that later. Did you do anything to prepare for today's

deposition?
A. I spoke with my lawyers.
Q. Did you review any documents in preparation for today's deposition?
A. No.
Q. Have you seen any of the deposition transcripts that were taken in this case?
A. I don't understand what you mean.
Q. So for this deposition, as an example, the court reporter is writing down everything that we say, and that will be produced as part of a written transcript. There have been other depositions taken in this case. For instance, one was taken of an employee of East Penn. And I was asking if you have read any of those transcripts?
A. No.
Q. Did you bring any documents to this deposition?
A. No.
Q. Going back to responsibilities around the house. Did you cook at the prior address that you had with John Evanoff?

A. Did I cook?
Q. Did you cook most of the meals when you were living at the prior address with John Evanoff?
A. Yes. Not most of them. We shared house duties. So he would cook sometimes. I would cook sometimes. He would clean if I was at work, things like that. We were equals in the home. It just depended on who worked, who was home. Whatever needed to be done, we worked together as a team to get done.
Q. Does anyone assist you with watching over your children today?
A. Typically, no. Today my best friend was able to come watch my toddler. My son is at school.
Q. Is he in second grade?
A. He's in third.
Q. Does your father assist at all with babysitting?
A. No. He's 74. He wouldn't be able to pick up I[redacted].
Q. And what about Mr. Deblasi?

A. No.
Q. I'm pulling up a document. It will be marked as an exhibit. Ms. Evanoff, I'm showing you a document which we'll mark as Exhibit Evanoff-1.
A. Okay.
Q. Take a moment to review this first page, and then I'll go to the next page. Let me know when you are ready.
MS. WEISS: Can you see this okay, Victoria?
THE WITNESS: It's a little -- I'm on my phone, so it's a little bit difficult.
MS. WEISS: Can we zoom in on it?
BY MR. LUONGO:
Q. I can try to zoom in. I'll ask you some specific questions about this.
A. Okay.
Q. So on the second page, which I'm scrolling to now, it has a signature at the bottom left.
A. Yes.



Q. Above the line for dependent/guardian/personal representative's signature, is that your signature?
A. Yes.
Q. And then going back to the first page of this document, which has a Bates stamp of East Penn 405, it has a title, Agreement For Compensation For Death. Do you see that?
A. Yes.
Q. And it refers to an injury date of March 3rd -- excuse me, March 6th, 2021. Do you see that?
A. Yes.
Q. And that relates to the accident involving John Evanoff, correct?
A. Yes.
Q. On the second page, it states a weekly rate of $613.76. Do you see that?
A. Yes.
Q. And is that the workers' compensation payment that you are currently receiving?

A. Yes.
Q. You mentioned before that there was some inconsistency in the payments. Can you tell me a little bit more about that?
A. Yes. So I don't remember the exact months that it was occurring or weeks that it was occurring. But several times, they had missed payments or they were late or they were on the wrong day. And this happened several times since I have been receiving them. So, yeah.
Q. Are they currently -- I'm sorry. Were you finished?
A. Yes.
Q. Are they currently making these payments on schedule?
A. Yes. Now they are.
Q. And have they paid you for any previous missed checks?
A. Not recently. But they have done that before.
Q. In other words, are they up to date and current with the payments?
A. Yes.

Q. Did you engage counsel in connection with a workers' compensation claim relating to John Evanoff?
A. As far as did I have a lawyer?
Q. Yes.
A. Yes.
Q. Who was that lawyer?
A. The initial lawyer that I used for setting up benefits, his name is John Koucher, Kucher.
Q. Okay.
A. I did not contact him. John's sisters did that for me. And then I spoke with him. So it was all...
Q. Were you introduced to him before the workers' compensation payments started to be made?
A. Do you mean did I speak to him as far as setting up the benefits and things of that nature before I started receiving them?
Q. I am just trying to determine the sequence. Did you start receiving benefits before meeting with this attorney or did

you meet with him after --
A. He set the benefits up.
Q. I see.
A. Yeah. I didn't know how to go through the paperwork and all of those things.
Q. And did this attorney assist you in making a claim against East Penn when payments were not being made on schedule?
A. Yes. He is one of, yes.
Q. You said, "one of." Were there other attorneys that assisted you relating to a workers' compensation claim against East Penn?
A. Gabrielle.
Q. You are referring to your attorney here today, Gabrielle Weiss?
A. Yes. When they were late. She did not assist in setting them up, though.
Q. And when they were late with payments, how was that resolved? Was there an agreement of any type?
A. I don't remember what the -- what the thing was called legally. I just know



Page 34

that I had a meeting, and after the meeting, they started paying on time.
Q. Do you know how --
A. I am not good --
Q. Go ahead.
A. I'm not good with the technical legal names of different meetings and things like that.
Q. Understood. And I'm only asking for what's within your knowledge.
A. Yeah.
Q. Do you know how the rate of approximately -- let me rephrase that.
Do you know how the rate of $613.76 was determined?
A. I don't know the technicalities. I know it has something to do with John's pay rate.
Q. Do you use any social media platforms?
A. Yes.
Q. Which ones do you use?
A. I use Facebook, Snapchat, Tiktok, the normal ones that everybody uses.

Page 35

Q. Do you have an Instagram?
A. Not anymore.
Q. We've been going for almost an hour. Are you comfortable to continue, or do you want to take a short break?
A. I'm okay continuing.
Q. What types of activities did John Evanoff do prior to the March 2021 accident in terms of personal life?
A. As far as in the home or like what was he interested in?
Q. I'll go through it. So did he have any hobbies?
A. Yes. John liked to play video games, watch movies, like go to the movies. We would go shopping, hang out with his friends, go on vacations, out to dinners. We were a family unit. So typically it wasn't just John. It was almost always like John, me and G[redacted], unless G[redacted] was with his grandmother.
Q. When you say, "grandmother," are you referring to your mother or John Evanoff's mother?

Page 36

A. No. My mother passed away when I was 16. So it's John. Any time that I say grandmother, that would be John's mother.
Q. Understood. Do you still maintain contact with John Evanoff's parents?
A. John did not have a father. But, yes, I still speak with Rose, his mother.
Q. I'm sorry. What was the last part?
A. G[redacted] still goes to visit her and things like that. So I do still speak with her.
Q. Do you have any type of relationship with John Evanoff's sisters?
A. Yes. They live in Ohio, so I don't typically get to see them in person. But we do still speak to each other, yes.
Q. How did John Evanoff help around the house?
A. He would -- we shared parenting responsibilities. He loved G[redacted]. So he was all about being around G[redacted] all the time. That wasn't like -- we just would both take care of G[redacted]. And then, like I said, depending on if I was at work or he

Page 37

was at work, it would just depend on who cooked, who cleaned. Whatever needed to be done, we would share responsibilities as far as that was. I did most of the cleaning, but he would definitely help. He would help do laundry. He always took out the trash. I didn't really take out the trash. Everything was pretty equal. He mostly did trash by himself. Otherwise, we shared responsibilities depending on when and what was going on working-wise.
Q. Was the video games something that John did on his own, or was that an interest that you also had?
A. I love video games, too, so does my son. We would all play video games together.
Q. Was John Evanoff diagnosed with any medical conditions prior to March 2021?
A. He was diagnosed with ADHD. He wasn't taking any medication for it, though. He didn't need it. He always functioned without any medications.
Q. When was he diagnosed with ADHD?



Page 38

A. He was probably a child, I would imagine. I know in school, he had to take medication for it. But after school, he stopped taking the medication and he was fine functioning at work and in the home without medication. So he didn't take any.
Q. Did he have any other health conditions or limitations of any type?
A. No.
Q. Did he have a primary care doctor?
A. Yes. I do not know the name of his doctor. I don't even remember where he went to the doctor.
Q. Had he ever been hospitalized prior to March 2021?
A. I do not recall. As far as severe injuries, I don't remember him having any severe injuries or anything like that.
Q. What about minor injuries?
A. Like what do you mean?
Q. It could be anything. A broken bone, a car accident?
A. No broken bones. We were in a car accident, but I think all he did was just

Page 39

sprain -- I don't even remember what he sprained. He just sprained something and it was fine in like a month.
Q. When was that car accident?
A. Oh, boy. I do not recall. It was very long before he worked at the factory. I know that. Like it -- yeah, I can't even tell you a year.
Q. What happened in that car accident? Were you with him at the time?
A. Yes. Oh, I do know the year, because I had just had G[redacted] by caesarean. It was a week, the same week that I had G[redacted], because I was concerned about my incision. I remember that. So it would have been in [redacted] 2015.
We were stopped at a stoplight in Muhlenberg and we were rear-ended. I got hurt. He was fine.
Q. What type of vehicle were you in?
A. It was -- I don't remember the year of it. It was a Chevy Sonic.
Q. Is that a sedan?
A. Yes. We just got it. It wasn't

Page 40

even a year old, I don't think.
Q. Was it totaled?
A. Yes.
Q. Did John Evanoff have any medical treatment in connection with that car accident?
A. I don't remember if he saw a doctor for anything related to that. He was more concerned with if I was okay, because I was in a lot of pain.
Q. Did you go to the hospital after that accident?
A. I may have seen -- I don't remember if I did. I may have just seen my doctor that delivered my son. Like I said, I had a caesarean. So that was my -- the seat belt hurt. But other than that, I don't think -- I don't remember if I went to like a Patient First or anything like that. I may have only seen like my follow-up -- like I just had my son. So I can't recall.
Q. And just to make sure I understand your testimony correctly, you had just given birth to G[redacted], and then shortly

Page 41

after, this accident occurred?
A. It was in the same week that I had given birth to G[redacted], yes.
Q. Was it just you and John Evanoff in the vehicle at the time of the accident?
A. Yes. G[redacted] was in the NICU for five months after he was born. He was a micro preemie. He was born at six months gestation, approximately, 26 weeks and some days. His sister was also born premature.
Q. You are referring to your daughter?
A. Yes.
Q. Was John Evanoff wearing a seat belt at the time of that accident?
A. Yes. He always -- we both always wore our seat belts. Safety is very important.
Q. Was John Evanoff a smoker?
A. Yes.
Q. Cigarettes?
A. Yes.
Q. Anything else?
A. No.
Q. Well, it could be cigars or



something like that.
A. No.
Q. Just cigarettes?
A. Yes.
Q. And how many cigarettes a day would he smoke on average?
A. Approximately maybe ten.
Q. So about half a pack of cigarettes a day?
A. Yes.
Q. Do you smoke?
A. Not anymore.
Q. When did you quit?
A. I don't know. I don't have an exact date. It's been a while.
Q. Was John Evanoff always a smoker from the time that you met in high school through March of 2021?
A. Yes.
Q. Did John Evanoff drink any alcohol?
A. Very rarely.
Q. Can you estimate the number of drinks a week on average?
A. It wasn't weekly.

Q. Any drug use?
A. No, no.
Q. What about prescription medications? Was John Evanoff prescribed any medications?
A. Not that I recall. I don't remember him taking anything daily. Not even -- I don't think he even -- no, not even -- no. He didn't even take supplements for him working out.
Q. You mentioned working out. Did he go to the gym? What are you referring to?
A. He didn't go to a gym. But he would do like, you know, pushups or just little things to try to stay healthy.
Q. Do you know what his height and weight were?
A. He was 6'1". His weight would fluctuate, give or take 10 pounds. I think he was around maybe 240 pounds.
Q. And was he in that weight range for approximately how long prior to 2021?
A. I don't really remember. I was with him for so long, it's blurry how much he

weighed when. Yeah, I'm not certain. John was always a large man. He was what I call -- I call lovingly a manly man. He was just a big guy, to me. I'm small.
Q. Do you feel like he gained weight over the time that you met him or was he always a large man, as you describe him?
A. Yeah. Because I met him when he was 19, and then he became a grown man as I was with him. We were together a very long time. Well, to me what is a long time.
Q. Would it be fair to say that maybe the 2015 to 2021 time period, he was approximately 230 to 240 pounds?
A. Yes.
Q. Did he have any doctors other than a primary care physician?
A. A dentist. But I don't remember where or who that was either. It was a small business.
Q. Did he have any hospitalizations that you can recall?
A. Like admissions?
Q. Going to the hospital for any

reason.
A. I don't remember him being -- having any hospital stays or anything like that, no.
Q. Do you recall any surgeries that he may have had?
A. No.
Q. Did he have any -- was he involved in any accidents other than that motor vehicle accident you described earlier?
A. No.
Q. So we talked earlier that John Evanoff began work at East Penn in or around December of 2020. At the time when he was there, did he say anything to you about his intentions to continue working at the company or maybe a desire to change jobs or go back to what he was doing before?
A. No. He was very excited to work there. The pay rate was much higher than his previous job. So he was very happy that he was going to be making more money.
Q. Did he have any other claims related



to work injuries prior to March 2021?
A. Claims? I'm not certain. I know he had gotten burnt on his cheek. But I don't know if the nurse filed any -- he went to see the nurse about that. But I don't know if they filed any paperwork on it. I'm not certain.
Q. When you say that he had gotten burnt on his cheek, was that while working at East Penn?
A. Yes.
Q. And when you said he went to see a nurse, would that be a nurse working at East Penn?
A. Yes.
Q. What was the extent of the burn?
A. It was maybe like -- maybe an inch long on his cheek here.
Q. Okay. And you are pointing to your right cheek?
A. I don't remember which cheek. It was near his eye-ish on his cheekbone area. Hot lead had splashed up on his face.
Q. Did he say anything to you about how

that incident occurred?
A. He said that there was lead stuck to something and when it detached and fell into the molten lead, then there was splash-up. I don't know exactly how everything works as far as that goes, but that's how he explained it to me.
Q. Did he describe his daily work activities to you?
A. Yes. Not in great detail. But I kind of knew what he did in general, if that's what you mean.
Q. Did he discuss any type of training that he may have received at East Penn?
A. I know he -- I don't know the specifics of the training. I don't think he was like -- I know he drove the forklift, but he wasn't -- they didn't yet give him the certification for it. But he was required to drive it. They made him drive it. So I know he did that. He only just finished training, I think, when the accident occurred, shortly before that. He still worked -- his partner that he worked

with was his trainer as well. But for the most part, I think he -- I don't know about, like, certifications or anything like that. But he was trained to do the job that he was doing.
Q. And that training was provided by East Penn?
A. Yes.
Q. You mentioned a partner that he worked with. Who were you referring to?
A. I don't know the man's name. I just -- well, I know his first name was Josh. I don't know anything else.
Q. Have you spoken with anyone at East Penn since the March 2021 incident?
A. As far as do you mean like -- well, the night of the incident, I had spoken to somebody when I called them to see if it was John that was involved in the accident. But other than that, no. And for his memorial, a woman had reached out from HR, I believe. But other than that, no. I always went through my lawyers.
Q. How did you come to learn of the

incident?
A. I was asleep on the couch waiting for him to come home. We were going to watch a movie together. G[redacted] was at his grandmother's. Can I have just a moment, please?
Q. Yes. We will go off the record.
(A brief recess was taken at this time.)
BY MR. LUONGO:
Q. We're back on.
A. I was asleep on the couch, and then I woke up to a message from my nephew on Facebook stating that there had been an accident at East Penn Manufacturing. And he wanted to know if John knew anything about it, because it was in the smelting building. And then I realized that John wasn't home, so I called them.
It was like 2:30 in the morning or something when I received the message. So I called them to see where John was and if he was still in the building. I thought maybe he had been held up because of, you



know, something happening in his building. Of course maybe they had to like traffic, or if there was an accident, maybe he had gotten hurt. I didn't know exactly what the accident was.

So I called them. And then I don't know how many people I spoke to. I know it was back and forth, and it was a mess. But I did speak to some people that night. They didn't actually -- they just said that he was involved in an accident. They didn't tell me of his death. They just said some folks were going to come around to talk to me. I remember that was their exact wording: Some folks are going to come around to talk to you then.

And then the coroner came to my house and stuff and talked to me a few hours later.

Q. Is that the first person to come to your home regarding this, the coroner?

A. Yeah. They came in a coroner marked vehicle.

Q. There was a memorial service for

John Evanoff, correct?

A. You mean did I have a memorial service or did the company have a memorial service?

Q. Sorry. One moment. Did you have a memorial service for John Evanoff?

A. Yes, I did.

Q. Is that the Theo C. Auman Funeral Home in Reading, Pennsylvania?

A. Yes.

Q. Did you set up any type of GoFundMe for John Evanoff? Excuse me. Let me rephrase that.

Did you set up any GoFundMe relating to your memorial service for John Evanoff?

A. I did not. His sisters, or sister, I believe, did.

Q. And did you receive any funds from setting that up?

MS. WEISS: Objection to the form.

You can answer.

THE WITNESS: What's that?

MS. WEISS: You can answer.

I just objected. But you can answer the question.

THE WITNESS: Okay. Yes, I did.

BY MR. LUONGO:

Q. I'm going to pull up another exhibit that will be marked. Ms. Evanoff, I'm showing you a document that will be marked as Exhibit Evanoff-2. It's a screenshot of a GoFundMe page set up in connection with John Evanoff. Is this a photo of you, John Evanoff and G[redacted] in this exhibit?

A. Yes.

Q. If you look to the right side, there's a donation goal. Do you see that?

A. Yes.

Q. And the $28,916, who did that go to?

A. Me.

Q. Did that cover funeral expenses?

A. Yes.

Q. And were there funds left over after paying for the funeral expenses?

A. Yes.

Q. Do you have any plans to return to

work?

A. Probably some day. Not in the near future.

Q. When your daughter begins school, have you given any thought as to whether or not you would go back to work at that time?

A. No. Well, I haven't thought about it. Not really. Maybe.

Q. Have you made any efforts currently to look for employment?

A. No.

MS. WEISS: Do you want to take a break for a few minutes, Victoria?

THE WITNESS: Yes, please.

MR. LUONGO: Let's go off the record.

(At this time, a short break was taken.)

BY MR. LUONGO:

Q. I only have a few follow-up questions for you.

Earlier in the deposition I asked about social media websites, and you



Page 54

mentioned Facebook, Snapchat, Tiktok. Do you have any special usernames on those accounts?
A. First I wanted to ask, is Gabrielle here?
MS. WEISS: I'm here.
THE WITNESS: Okay. I'm trying to remember what they are. My Facebook account is my name, Victoria Evanoff. And then my Tiktok account -- what's the name? I don't recall what the name is. It's under my name, but I don't know -- I can't remember what the username is. And my Snapchat also shows up under my name. I don't remember what the username is.
BY MR. LUONGO:
Q. Is Mr. Deblasi currently in a relationship?
A. I'm not certain. I don't believe so.
Q. Is he close with your daughter, his daughter?

Page 55

A. He sees her every day since he lives here and she lives here.
Q. Does he assist with taking care of her?
A. Not particularly.
Q. Do you speak with him on a daily basis?
A. In passing, like if we happen to be in the same room.
Q. Did your relationship with him change since the time that you bought your current home? In other words, were you together when you bought the house?
A. Yes.
Q. So you were in a relationship with Mr. Deblasi when you purchased the home?
A. Yes.
Q. But at a later date, you split up with him?
A. Yes.
Q. What is the ownership interest of the house between you and Mr. Deblasi?
A. What do you mean?
Q. In terms of percentage, is it split

Page 56

equally or is it some other distribution?
A. I believe so.
Q. You believe that it's split equally between you and Mr. Deblasi?
A. Legally, yes. Financially, I've always paid everything.
Q. What is the monthly mortgage payment?
A. Approximately $2,100. I have everything on automatic out of my bank account. But I believe that's what it is.
Q. And then in addition to that, do you pay electricity and utilities separate?
A. Yes. I pay -- I have water, trash, sewer, and I have electric and I have gas, and then the taxes are in with the mortgage.
Q. Is this a single-family home as opposed to a house that's connected to other homes?
A. Single family.
Q. Is G[redacted] involved in any school activities or after-school activities today?

Page 57

A. Do you mean is he at school?
Q. Well, I understand that he's in third grade. Does he do any after-school activities?
A. No, he doesn't. He's not interested. I've tried to get him in to science. He's very interested in science. But he doesn't attend any after-school programs.
Q. Is he playing any sports or anything of that nature?
A. Oh, no. G[redacted] doesn't like contact sports. He doesn't -- he's not a sporty boy. He likes more like art and music. He really likes -- his favorite thing he said is recess.
Q. What does he like about that?
A. Recess? He's a social butterfly. He loves playing with friends.
Q. So does he bring friends home after school?
A. No. He just has school friends, really. He doesn't -- he doesn't have anybody that comes over yet.

Q. Would you describe him as an outgoing personality?
A. Yeah. He's very friendly. He's very compassionate, a very kind boy.
Q. Does he help take care of his half sister?
A. Yes. He loves -- oh, he loves her. He loves her so much. They are funny.
Q. I am just looking over my notes to see if I have anything else.
You mentioned the workplace incident where John had a burn on his cheek. Do you recall that testimony?
A. I do.
Q. Did he mention any concerns to you about working at East Penn, or was he happy to be there?
A. As far as concerns, the only concern that he had was his respirator, really. He did say it was like -- the area that he worked in was like a really busy, bustling area, I guess as far as like people moving around and stuff. But he was happy to be working there, so he wasn't -- he didn't

want to leave East Penn or anything like that. But, you know, you are working with hot lead. It's hot. He had mentioned that it was hot in the building that he worked in. He only worked there a short time, so he was happy to be making more money. He was happy I was going to be able to be a stay-at-home mom. We were looking forward to the future.
Q. Did you ever go to East Penn prior to the March 2021 incident?
A. I actually had applied there before, but I wasn't hired. I had been there for an interview. That's it. I don't remember when, though.
Q. What was the position that you interviewed for?
A. I don't recall what the position exactly was named as. I think it had something to do probably, like, battery assembly.
Q. Was it a position to be working on the floor of the plant or some other front desk type role?

A. No, it was not a desk. It would have been like on the floor.
Q. And I believe that you mentioned earlier that a friend had mentioned that East Penn was looking to hire. Did you interview based on the person making that statement to you, or was this before John Evanoff applied?
A. It was before John applied for his position, much, much before he applied. It was a different person that had -- the person that told me about the position that I interviewed for was a totally different person than who the person that told him. Mine was my own friend that had told me.
Q. Did you ever mention East Penn to John Evanoff as a potential employment opportunity?
A. Not particularly. I mean, East Penn is one of the largest factories in our area, so it's kind of like common knowledge that that's like one of the places to work if you want to make good money. So a lot of people work there in this area.

Q. Did you and John Evanoff have a social circle of friends, or did you mostly spend time together between the two of you?
A. I don't have many friends myself. We shared most of our friends. He did have some friends that I didn't really know, more so associates, I guess. John was very popular in high school. I was more of an introvert. So he had many, many, I guess you could call them acquaintances more so than friends. But our close-knit friends circle were our friends. We were with each other constantly.
Q. Do you still maintain contact with those friends?
A. I don't really talk to any of the friends, no, that he had then before the accident. I don't, no.
MR. LUONGO: Thank you for your time today, Ms. Evanoff. I don't have any other questions. I'll turn it over to your counsel if she does. But I appreciate your taking the time this morning. I



know it was -- we had to talk about some emotional issues, so I appreciate that. Thank you.
THE WITNESS: Thank you.
BY MS. WEISS:
Q. I just have a few questions for you. Do you recall today talking about whether Mr. Deblasi contributed financially towards the home that you currently live in?
A. Yes.
Q. Does Mr. Deblasi contribute to any of the utilities, water, trash, sewer, electric or gas?
A. No.
Q. Does he pay anything towards the taxes on the house?
A. No.
Q. Does he pay you any type of rent?
A. No.
Q. Does he pay any type of child support?
A. No.
MS. WEISS: I have no further questions. Thank you, Victoria.

BY MR. LUONGO:
Q. I have a couple follow-up. On the child support, is that something that you've requested him to assist with?
A. I did request it, yes. I did not follow through.
Q. What was his response on contributing to all these things, the utilities, the taxes, rent and the child support?
A. I didn't -- I never really asked him for any money to stay here. I want him to be able to save his money so that he can live on his own at some point. So he's just been saving money so that he can get his own place separate from this home.
Q. I apologize if I asked this earlier. But what is he currently doing for work?
A. I'm not certain of his job title. He works in a factory, Keurig Dr. Pepper.
MR. LUONGO: That's right. Okay. Thank you, Ms. Evanoff.
(Deposition concluded at 12:03 p.m.)

(At this time, documents were marked for identification as Exhibit Nos. Evanoff-1 and Evanoff-2.)

C E R T I F I C A T E

I, KRISTIN N. McCUSKER, Registered Merit Reporter, Certified Realtime Reporter and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the stenographic notes taken by me in the aforementioned matter.

\- - -

DATE: ____________________________
Kristin N. McCusker, RPR, RMR, CRR,
Notary Public

