# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VICTORIA EVANOFF, as Administrator ) NO. 5:23-cv-03417-JFL
of the ESTATE OF JOHN EVANOFF,     )
DECEASED                            )
                                    )
     - vs -                         )
                                    )
MARSH USA, LLC,                     )
THERESE PERRETTE, and               )
JOHN DOE DEFENDANTS # 1-2           )
- - - - - - - - - - - - - - - - - -

REMOTE DEPOSITION OF VICTORIA EVANOFF, held via Zoom, taken by and before KRISTIN N. McCUSKER, Registered Merit Reporter, Certified Realtime Reporter and Notary Public, on Tuesday, January 23, 2024, commencing at 10:05 a.m.

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



```
                                          Page 2
  1     A P P E A R A N C E S:  (Zoom)
  2
  3
          ANAPOL WEISS
  4       BY:  GABRIELLE I. WEISS, ESQUIRE
             One Logan Square
  5          130 N. 18th Street, Suite 1600
             Philadelphia, Pennsylvania 19103
  6
             Counsel for the Plaintiffs
  7
  8
  9
          GOLDBERG SEGALLA, LLP
 10       BY:  MICHAEL LUONGO, ESQUIRE
             1700 Market Street, Suite 1418
 11          Philadelphia, Pennsylvania 19103
 12          Counsel for the Defendants
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
```

```
                                          Page 3
  1                     I N D E X
  2
  3     WITNESS                               PAGE
  4     VICTORIA EVANOFF
  5        By:  Mr. Luongo                    4, 63
  6        By:  Ms. Weiss                     62
  7
  8
  9
 10                    E X H I B I T S
 11
 12                                           PAGE
        NO.        DESCRIPTION                MARKED
 13
 14     Evanoff-1  Agreement For Compensation  64
                   For Death
 15     Evanoff-2  GoFundMe Page               64
 16
 17
 18
 19
 20
 21
 22
 23
 24
```

```
                                          Page 4
  1            (By agreement of counsel, the
  2        sealing, filing, and certification
  3        are waived; and all objections,
  4        except as to the form of the
  5        question, are reserved until the
  6        time of trial.)
  7
  8            VICTORIA EVANOFF, after having
  9        been duly sworn, was examined and
 10        testified as follows:
 11
 12     BY MR. LUONGO:
 13     Q.   Good morning, Ms. Evanoff.  My name
 14     is Michael Luongo.  I'm with the law firm
 15     of Goldberg Segalla, and I represent
 16     Defendants, Marsh USA and Therese Perrette
 17     in this action.
 18         First, we'll take breaks as needed.
 19     So if you need to stop at any time, just
 20     let me know and we'll try to accommodate
 21     that.
 22         Where are you currently located for
 23     this deposition?
 24     A.   Like what room in my home?
```

```
                                          Page 5
  1     Q.   Well, you said your home.  So that's
  2     what I'm trying to get at.  Are you at your
  3     home right now?
  4     A.   Yes.
  5     Q.   Is there anyone else present with
  6     you?
  7     A.   I'm by myself.
  8     Q.   You're testifying under oath today.
  9     Do you understand that your testimony has
 10     the same effect as if we were in court?
 11     A.   Yes.
 12     Q.   I have a few instructions for you.
 13     Please allow me to finish my question
 14     before you begin your answer even if you
 15     know where I'm going with my question.
 16     That way it makes it easy for the court
 17     reporter to transcribe everything that
 18     we're saying.  It becomes difficult if
 19     we're talking over one another.  Is that
 20     understood?
 21     A.   Yes.
 22     Q.   Also please make sure to give me
 23     verbal responses.  Gestures won't come
 24     through in a written transcript.  Okay?
```

2 (Pages 2 to 5)



Page 6

```
 1    A.   Yes.
 2    Q.   Also you are not required to guess
 3    or speculate at an answer.  So if you don't
 4    know something, just let me know that.  But
 5    if you are able to estimate, you can tell
 6    me that you are giving me an estimate.
 7    Understood?
 8    A.   Yes.
 9    Q.   If you don't understand any of my
10    questions, please let me know.  I will try
11    to rephrase.  But if you do respond to my
12    question, I will assume that you understood
13    it and are giving me your best answer.
14    Okay?
15    A.   Yes.
16    Q.   Are you taking any medications that
17    would affect your ability to testify today?
18    A.   No.
19    Q.   Can you please state your full name
20    for the record?
21    A.   Victoria Lei Evanoff.
22    Q.   And your middle name, is that
23    spelled L-E-I?
24    A.   Yes.
```

Page 7

```
 1    Q.   What is your date of birth?
 2    A.              1993.
 3    Q.   Do you have an e-mail address?
 4    A.   Yes.
 5    Q.   What e-mail address or addresses do
 6    you currently use?
 7    A.   The only one that I access is
 8    v.evanoff93@gmail.com.
 9    Q.   My next question, I'm going to ask
10    it on the record and then we can go off the
11    record when you give me your response.  So
12    I'm going to ask for your Social Security
13    number.  And we can go off the record and
14    you can tell me that.  Okay?
15         Agree to go off the record,
16    Gabrielle?
17             MS. WEISS:  Yes.
18    BY MR. LUONGO:
19    Q.   So the Social?
20    A.   (Social Security was given at this
21    time.)
22    Q.   Do you have a home telephone number
23    or just a cell?
24    A.   I do.  I don't know what it is.  I
```

Page 8

```
 1    don't even have a phone hooked up to it.
 2    Q.   Okay.  But you have a cell phone?
 3    A.   Yes.
 4    Q.   And what is your cell phone number?
 5    A.   (484) 338-3361.
 6    Q.   Is your current home address 236
 7    East Elm Street, Reading, PA 19607?
 8    A.   Yes.  Except not -- I don't use
 9    Reading.  I use Shillington, because there
10    is an Elm Street in the City of Reading,
11    and Shillington is a borough.
12    Q.   Okay.  Just to make sure that we
13    have it accurate on the transcript, can you
14    state your current address?
15    A.   236 East Elm Street, Shillington,
16    Pennsylvania 19607.
17    Q.   How long have you lived at that
18    address?
19    A.   Since 2021.
20    Q.   Does October of 2021 sound right to
21    you?
22    A.   2022, actually.  I believe I was
23    incorrect about '21.  I don't know.  I
24    can't remember which year it was.
```

Page 9

```
 1    Q.   Some time between 2021 and 2022?
 2    A.   Yeah.  It was -- it was 2022.  Yes,
 3    for sure.
 4    Q.   Is that a house or an apartment?
 5    A.   Yeah, it's a house.
 6    Q.   Do you own that property or rent?
 7    A.   Own.
 8    Q.   Where did you live prior to moving
 9    to your current location?
10    A.   I lived at my father's house for a
11    short amount of time.
12    Q.   What was the address of that
13    location?
14    A.   3313 Fairfield Street, Laureldale,
15    Pennsylvania 19605.
16    Q.   Did you previously have an address
17    at 117 Colonial Drive?
18    A.   Yes.  That's where my last address
19    with John was located.
20    Q.   And you are referring to John
21    Evanoff, correct?
22    A.   Yes.
23    Q.   So give me the full address for that
24    property.
```

3 (Pages 6 to 9)



MAGNA LEGAL SERVICES

Page 10

```
 1    A.    That was 117 A Colonial Drive,
 2    Shillington, Pennsylvania 19607.
 3    Q.    Was that an apartment?
 4    A.    Yes.
 5    Q.    And you rented that apartment?
 6    A.    He -- it was in his name.  But, yes.
 7    Q.    An apartment rented in John
 8    Evanoff's name, correct?
 9    A.    Yes.  I was the resident.  He was
10    the leaseholder.
11    Q.    Okay.  And how long did you live at
12    that location?
13    A.    Approximately two years, I believe.
14    Q.    And do you recall when you moved
15    from that property to 3313 Fairfield
16    Street?
17    A.    I don't remember the exact month.  I
18    believe it was April of 2021.
19    Q.    And if you were there for two years,
20    does that mean that you would have moved in
21    sometime in 2019?
22    A.    Yes.
23    Q.    At your current location at 236 East
24    Elm Street, who else lives at that address?
```

Page 11

```
 1    A.    My elderly father lives with myself
 2    and my two children, as well as my
 3    daughter's father temporarily.
 4    Q.    Has your mother passed away?
 5    A.    Yes.
 6    Q.    The address that you mentioned, 3313
 7    Fairfield Street, that was a property that
 8    your father owned?
 9    A.    Yes.
10    Q.    And did he sell that property?
11    A.    Yes.
12    Q.    Are you the sole owner of your house
13    or do others have an ownership interest in
14    the house?
15    A.    My daughter's father has ownership
16    interest in the house.
17    Q.    What is your daughter's father's
18    name?
19    A.    Andrew L. Deblasi.
20    Q.    What is your relationship to him?
21    A.    We are not together.
22    Q.    Did you say that he currently lives
23    in your house?
24    A.    He does.
```

Page 12

```
 1    Q.    So what do you mean by, "we are not
 2    together"?
 3    A.    We are not -- we are not seeing each
 4    other.  We just live together as roommates
 5    and co-parents.
 6    Q.    When did you meet Mr. Deblasi?
 7    A.    We are childhood friends.
 8    Q.    What is your daughter's name?
 9    A.    I█████████ █████.
10    Q.    How old is your daughter?
11    A.    She is going to be 2 on
12    █████████.
13    Q.    Did you at some time form a
14    relationship with Mr. Deblasi after March
15    of 2021?
16    A.    Yes.
17    Q.    And how long were you in a
18    relationship with Mr. Deblasi?
19    A.    From June of 2021 until December of
20    2022.
21    Q.    Are you in a relationship with
22    anyone else currently?
23    A.    No.
24    Q.    Do you have any plans to move in the
```

Page 13

```
 1    next year?
 2    A.    No.
 3    Q.    You also stated that your son lives
 4    at your current residence, correct?
 5    A.    Yes.
 6    Q.    And that is G█████ ███████?
 7    A.    Yes.
 8    Q.    And G█████ is the son of you and
 9    John Evanoff, correct?
10    A.    Yes.
11    Q.    When was G█████ born?
12    A.    G█████ was born █████████ 2015.
13    Q.    When did you meet John Evanoff?
14    A.    We were high school sweethearts.  So
15    I believe I was 16.  I'm not sure what year
16    that was.  I want to say 2010.  Yes,
17    because it was a month after my mom passed.
18    Yeah, 2010.
19    Q.    You were about 16 or 17 at that
20    time?
21    A.    Yes.  I was going to be 17 shortly
22    after John and I started dating, which was
23    in July of 2010.  I turned 17 that August.
24    Q.    And you were married on July 14,
```



Page 14

```
 1   2012?
 2   A.   Yes.
 3   Q.   What is your highest level of
 4   education?
 5   A.   Some college at community college.
 6   Q.   Where did you attend high school?
 7   A.   Muhlenberg High School.
 8   Q.   Did John Evanoff also graduate from
 9   Muhlenberg High School?
10   A.   Yes.  He was two grades above me.
11   So he graduated in 2009.
12   Q.   And you graduated in 2011?
13   A.   I was meant to.  I graduated in
14   2012.
15   Q.   How many years or semesters did you
16   attend community college?
17   A.   Four semesters.  So two years.
18   Q.   And in what years did you attend
19   community college?
20   A.   That would have been -- I took a
21   year off after I graduated high school, and
22   then I did the two years.  So 2013 to 2015,
23   I believe that would have been.
24   Q.   Did you have any other training or
```

Page 15

```
 1   education related to work or employment?
 2   A.   No.
 3   Q.   Are you currently employed?
 4   A.   No.
 5   Q.   Have you ever been employed?
 6   A.   Yes.
 7   Q.   What was your job and where were you
 8   employed?
 9   A.   My last job?
10   Q.   We can work our way back.  So we'll
11   start with your last job.
12   A.   My last job was at Merry Maids.  I
13   was just a regular maid.
14   Q.   When did you have that job?
15   A.   I don't remember when I started.  I
16   ended, or resigned, I should say, the week
17   that the accident occurred.
18   Q.   And are you referring to the
19   March 6th, 2021, accident, involving John
20   Evanoff?
21   A.   Yes.
22   Q.   So you have not been employed since
23   March 2021?
24   A.   No.
```

Page 16

```
 1   Q.   And just to be clear for the
 2   transcript, when you say no, you are
 3   agreeing that you have not been employed
 4   since that date, right?  I'm sorry.  I
 5   didn't hear that.
 6   A.   Correct.
 7   Q.   Thank you.  And prior to Merry
 8   Maids, what jobs did you hold?
 9   A.   Before Merry Maids, I worked at --
10   I'm trying to think in chronological order
11   -- Supportive Concepts for Families, which
12   is a nonprofit organization which takes
13   care of mentally handicapped individuals.
14   And then before that, I worked in a factory
15   for a very short amount of time packing
16   pretzels.  I think that factory was called
17   Savor Street Foods.  Right before I worked
18   there, I worked at -- I'm not certain if
19   Zerbe Sisters Community Living, which is a
20   nursing home, was before the factory or
21   after the factory.  I cannot remember.  I
22   do not recall.  But I did work in another
23   nursing home at some point.  And I also
24   worked at GameStop.  And then my very first
```

Page 17

```
 1   job was in a nursing home in the kitchen.
 2   And that was called Rittenhouse Senior
 3   Living.
 4   Q.   Where was Rittenhouse Senior Living?
 5   What town?
 6   A.   When did I work there?
 7   Q.   No.  I was asking what town it's
 8   located in.
 9   A.   Reading, I believe.  It may be
10   listed as Laureldale, even.
11   Q.   Where were you born?
12   A.   Reading, Pennsylvania, at the
13   Reading Hospital.
14   Q.   And have you lived in the Reading
15   area your whole life?
16   A.   Yes.  I attended Muhlenberg School
17   District my entire life.  I lived in one
18   house.  My parents were always together.
19   Q.   Is that one house the property you
20   mentioned earlier that was, I believe,
21   3313?
22   A.   Yes.
23   Q.   Do you know what your salary or
24   hourly wage was at Merry Maids?
```



Page 18

```
 1      A.   It was a sliding pay scale.  So I
 2   started at $11 for the first month, but
 3   then it was based on how well you were
 4   cleaning, your ratings.  So after the first
 5   month, I made $14 an hour until I stepped
 6   down to be part time.  I do not recall when
 7   I stepped down to be part time.
 8          John and I had plans for me to be a
 9   stay-at-home mom when he started working at
10   Deka.  So we wanted to test out if we could
11   do it financially first.  So then I stepped
12   down to part time, and then I went back
13   down to $11 an hour from $14.  And then I
14   stayed at the $11 an hour until I resigned.
15      Q.   And you were working at Merry Maids
16   from December through March -- December of
17   2020 through March of '21 when John was
18   employed at Deka?
19      A.   I believe so, yes.
20      Q.   And Deka, that's another name for
21   East Penn Manufacturing Company, correct?
22      A.   Correct.
23      Q.   John Evanoff started employment at
24   East Penn Manufacturing Company in December
```

Page 19

```
 1   of 2020, correct?
 2      A.   That sounds to be correct.  I don't
 3   know for sure.  But approximately, yes.
 4      Q.   What did he do for employment prior
 5   to working at East Penn?
 6      A.   He took care of mentally handicapped
 7   individuals.  I know for a short amount of
 8   time, it was for a for-profit organization.
 9   I do not remember the name of that
10   organization.  I think he was only with
11   that one for six months.
12          For, I want to say, maybe
13   approximately four years before that, he
14   worked for Supportive Concepts for
15   Families, which is a nonprofit
16   organization, as a community home
17   supervisor taking care of mentally
18   handicapped individuals.
19      Q.   Did John Evanoff have any education
20   beyond high school?
21      A.   Yes.  For a short amount of time, he
22   went to Reading Area Community College,
23   only a few semesters.
24      Q.   You said, was it Reading Area
```

Page 20

```
 1   Community College?
 2      A.   Yes.
 3      Q.   Is that the same community college
 4   that you attended?
 5      A.   Yes.
 6      Q.   Did you attend at the same time or
 7   at different times?
 8      A.   Different times.
 9      Q.   How did John Evanoff come to be
10   employed at East Penn?
11      A.   How did he hear about it?
12      Q.   Yes.
13      A.   Through a friend of ours.  He just
14   mentioned they were hiring.  So John
15   applied and interviewed with them and was
16   hired.
17      Q.   Is that friend someone that's
18   employed at East Penn?
19      A.   He's no longer employed at East
20   Penn.
21      Q.   Was he employed at the time?
22      A.   Yes.
23      Q.   What is his name or her name?
24      A.   I do not recall.  He wasn't my
```

Page 21

```
 1   friend.
 2      Q.   What are your current daily
 3   activities?
 4      A.   As far as what do I do at home?
 5      Q.   You said that you are not currently
 6   employed.  So what activities take up the
 7   majority of your day?
 8      A.   I'm a stay-at-home mom.  I cook.  I
 9   clean.  I run errands, paying bills,
10   grocery shopping, taking G____ to and
11   from school, doctor's appointments.  Being
12   a mom.
13      Q.   Is your daughter attending any type
14   of pre-school yet?
15      A.   No.  She's too little.
16      Q.   Have your daily activities around
17   the house changed at all between now and
18   2020?
19      A.   As far as is it more difficult for
20   myself?
21      Q.   Well, the types of activities that
22   you do, have they changed at all?
23      A.   Yes.  As far as I used to not have
24   to take out the trash or carry the laundry
```

6 (Pages 18 to 21)



```
                                                      Page 22
 1   basket, things -- like the smaller things.
 2   I used to not have to pay the bills.  But I
 3   didn't live in this home then, so it was a
 4   little bit different.  There's much more
 5   responsibility in a home than there is in
 6   an apartment.  So I have many more
 7   responsibilities now than I used to.
 8   Q.    Does Mr. Deblasi help at all with
 9   activities or household chores?
10   A.    No.
11   Q.    Is there a reason why not?
12   A.    He's not here most of the time.
13   Q.    Go ahead.
14   A.    He just sleeps here, really.
15   Q.    Do you have a mortgage on the house?
16   A.    Yes.
17   Q.    Does Mr. Deblasi pay towards the
18   mortgage?
19   A.    No.
20   Q.    Is Mr. Deblasi working?
21   A.    Yes.
22   Q.    What does he do for employment?
23   A.    I'm not certain of his job title.
24   He works for Keurig Dr. Pepper.
```

```
                                                      Page 23
 1   Q.    Who else did you say owns your
 2   house?
 3   A.    Just myself and Mr. Deblasi.
 4   Q.    So he's on the mortgage, but he's
 5   not paying towards the mortgage?
 6   A.    Correct.  He has never paid towards
 7   the mortgage.
 8   Q.    Is that something you asked to do
 9   and he declined?
10   A.    No.  He most of the time has not
11   lived here.
12   Q.    Approximately how large was the
13   apartment that you had with John Evanoff in
14   2020?
15   A.    As far as square foot?
16   Q.    Well, first just describe it
17   generally.  Was it a one-bedroom or a
18   studio?
19   A.    No.  It was a two-bedroom apartment.
20   It had a living room, a dining room, a
21   kitchen, a hallway, two bedrooms, a full
22   bathroom and a half bath.
23   Q.    And do you know approximately what
24   the square footage was?
```

```
                                                      Page 24
 1   A.    I'm not certain, no.
 2   Q.    And what about the house that you
 3   are currently living in, how many bedrooms,
 4   bathrooms and size?
 5   A.    It's a four-bedroom, one and a half
 6   bath home.  It has a living room, dining
 7   room, kitchen, mudroom.  That's it.  I
 8   don't know square footage.
 9   Q.    Does anyone else in your current
10   residence assist with household chores?
11   A.    No.  My dad will sometimes do the
12   dishes.  He does his own laundry.  But he
13   doesn't help me with my children or
14   anything like that.  I do all the cooking,
15   cleaning, all of those things.  My father
16   is elderly.
17   Q.    Does your father make any financial
18   contributions to you?
19   A.    No.
20   Q.    Is he receiving Social Security?
21   A.    Yes.  But he keeps that for himself.
22   Q.    What are your current sources of
23   income?
24   A.    My current -- that would be I get
```

```
                                                      Page 25
 1   approximately $613 for workers'
 2   compensation from Sedgwick, and then I get
 3   Social Security, approximately $1,700 a
 4   month in Social Security, one of the
 5   checks, and then another one for $1,700.
 6   So $3,200 in Social Security and then $613
 7   for workers' compensation.
 8   Q.    Do you know why you get two Social
 9   Security checks?
10   A.    One of their survivor benefits.  So
11   one of them is until G█████ is until 16.
12   He was 5 when the incident occurred.  So
13   one of them is more so because he was so
14   young, I believe, so that one is for --
15   more for me.  And then the other one is
16   until he graduates -- until he's 18 or
17   graduates high school.
18   Q.    Are you saying that both of those
19   Social Security checks are expected to end
20   when G█████ is at age 16 and 18?
21   A.    One of them ends when he is 16, one
22   of them ends when he is 18.  So I will not
23   be receiving any Social Security at all by
24   the age of 18, his age of 18.
```



Page 26

1  Q.  I'm going to switch topics slightly.
2  Have you ever given a deposition before?
3  A.  No.  I've never done anything legal
4  before.
5  Q.  This action that brings us here
6  today is the first lawsuit that you've been
7  involved with.  Is that correct?
8  A.  As far as like getting in trouble
9  and things like that?
10  Q.  Well, either ones that you filed or
11  ones that you've been named in.  Have you
12  been involved in any other lawsuit?
13  A.  I'm not certain if it counts.
14  Sedgwick was late paying my checks before,
15  so I pursued something with that.  But
16  other than that, I've never had any kind of
17  lawsuits other than this.
18  Q.  And when you were referring to
19  Sedgwick being late paying checks, are you
20  referring to workers' compensation in
21  connection with John Evanoff?
22  A.  Yes.  They were inconsistent.
23  Q.  We'll get into that later.  Did you
24  do anything to prepare for today's

Page 27

1  deposition?
2  A.  I spoke with my lawyers.
3  Q.  Did you review any documents in
4  preparation for today's deposition?
5  A.  No.
6  Q.  Have you seen any of the deposition
7  transcripts that were taken in this case?
8  A.  I don't understand what you mean.
9  Q.  So for this deposition, as an
10  example, the court reporter is writing down
11  everything that we say, and that will be
12  produced as part of a written transcript.
13  There have been other depositions taken in
14  this case.  For instance, one was taken of
15  an employee of East Penn.  And I was asking
16  if you have read any of those transcripts?
17  A.  No.
18  Q.  Did you bring any documents to this
19  deposition?
20  A.  No.
21  Q.  Going back to responsibilities
22  around the house.  Did you cook at the
23  prior address that you had with John
24  Evanoff?

Page 28

1  A.  Did I cook?
2  Q.  Did you cook most of the meals when
3  you were living at the prior address with
4  John Evanoff?
5  A.  Yes.  Not most of them.  We shared
6  house duties.  So he would cook sometimes.
7  I would cook sometimes.  He would clean if
8  I was at work, things like that.  We were
9  equals in the home.  It just depended on
10  who worked, who was home.  Whatever needed
11  to be done, we worked together as a team to
12  get done.
13  Q.  Does anyone assist you with watching
14  over your children today?
15  A.  Typically, no.  Today my best friend
16  was able to come watch my toddler.  My son
17  is at school.
18  Q.  Is he in second grade?
19  A.  He's in third.
20  Q.  Does your father assist at all with
21  babysitting?
22  A.  No.  He's 74.  He wouldn't be able
23  to pick up I███.
24  Q.  And what about Mr. Deblasi?

Page 29

1  A.  No.
2  Q.  I'm pulling up a document.  It will
3  be marked as an exhibit.  Ms. Evanoff, I'm
4  showing you a document which we'll mark as
5  Exhibit Evanoff-1.
6  A.  Okay.
7  Q.  Take a moment to review this first
8  page, and then I'll go to the next page.
9  Let me know when you are ready.
10       MS. WEISS:  Can you see this
11  okay, Victoria?
12       THE WITNESS:  It's a
13  little -- I'm on my phone, so it's a
14  little bit difficult.
15       MS. WEISS:  Can we zoom in on
16  it?
17  BY MR. LUONGO:
18  Q.  I can try to zoom in.  I'll ask you
19  some specific questions about this.
20  A.  Okay.
21  Q.  So on the second page, which I'm
22  scrolling to now, it has a signature at the
23  bottom left.
24  A.  Yes.

8 (Pages 26 to 29)



Page 30

```
 1   Q.    Above the line for
 2   dependent/guardian/personal
 3   representative's signature, is that your
 4   signature?
 5   A.    Yes.
 6   Q.    And then going back to the first
 7   page of this document, which has a Bates
 8   stamp of East Penn 405, it has a title,
 9   Agreement For Compensation For Death.  Do
10   you see that?
11   A.    Yes.
12   Q.    And it refers to an injury date of
13   March 3rd -- excuse me, March 6th, 2021.
14   Do you see that?
15   A.    Yes.
16   Q.    And that relates to the accident
17   involving John Evanoff, correct?
18   A.    Yes.
19   Q.    On the second page, it states a
20   weekly rate of $613.76.  Do you see that?
21   A.    Yes.
22   Q.    And is that the workers'
23   compensation payment that you are currently
24   receiving?
```

Page 31

```
 1   A.    Yes.
 2   Q.    You mentioned before that there was
 3   some inconsistency in the payments.  Can
 4   you tell me a little bit more about that?
 5   A.    Yes.  So I don't remember the exact
 6   months that it was occurring or weeks that
 7   it was occurring.  But several times, they
 8   had missed payments or they were late or
 9   they were on the wrong day.  And this
10   happened several times since I have been
11   receiving them.  So, yeah.
12   Q.    Are they currently -- I'm sorry.
13   Were you finished?
14   A.    Yes.
15   Q.    Are they currently making these
16   payments on schedule?
17   A.    Yes.  Now they are.
18   Q.    And have they paid you for any
19   previous missed checks?
20   A.    Not recently.  But they have done
21   that before.
22   Q.    In other words, are they up to date
23   and current with the payments?
24   A.    Yes.
```

Page 32

```
 1   Q.    Did you engage counsel in connection
 2   with a workers' compensation claim relating
 3   to John Evanoff?
 4   A.    As far as did I have a lawyer?
 5   Q.    Yes.
 6   A.    Yes.
 7   Q.    Who was that lawyer?
 8   A.    The initial lawyer that I used for
 9   setting up benefits, his name is John
10   Koucher, Kucher.
11   Q.    Okay.
12   A.    I did not contact him.  John's
13   sisters did that for me.  And then I spoke
14   with him.  So it was all...
15   Q.    Were you introduced to him before
16   the workers' compensation payments started
17   to be made?
18   A.    Do you mean did I speak to him as
19   far as setting up the benefits and things
20   of that nature before I started receiving
21   them?
22   Q.    I am just trying to determine the
23   sequence.  Did you start receiving benefits
24   before meeting with this attorney or did
```

Page 33

```
 1   you meet with him after --
 2   A.    He set the benefits up.
 3   Q.    I see.
 4   A.    Yeah.  I didn't know how to go
 5   through the paperwork and all of those
 6   things.
 7   Q.    And did this attorney assist you in
 8   making a claim against East Penn when
 9   payments were not being made on schedule?
10   A.    Yes.  He is one of, yes.
11   Q.    You said, "one of."  Were there
12   other attorneys that assisted you relating
13   to a workers' compensation claim against
14   East Penn?
15   A.    Gabrielle.
16   Q.    You are referring to your attorney
17   here today, Gabrielle Weiss?
18   A.    Yes.  When they were late.  She did
19   not assist in setting them up, though.
20   Q.    And when they were late with
21   payments, how was that resolved?  Was there
22   an agreement of any type?
23   A.    I don't remember what the -- what
24   the thing was called legally.  I just know
```



Page 34

```
 1   that I had a meeting, and after the
 2   meeting, they started paying on time.
 3   Q.    Do you know how --
 4   A.    I am not good --
 5   Q.    Go ahead.
 6   A.    I'm not good with the technical
 7   legal names of different meetings and
 8   things like that.
 9   Q.    Understood.  And I'm only asking for
10   what's within your knowledge.
11   A.    Yeah.
12   Q.    Do you know how the rate of
13   approximately -- let me rephrase that.
14         Do you know how the rate of $613.76
15   was determined?
16   A.    I don't know the technicalities.  I
17   know it has something to do with John's pay
18   rate.
19   Q.    Do you use any social media
20   platforms?
21   A.    Yes.
22   Q.    Which ones do you use?
23   A.    I use Facebook, Snapchat, Tiktok,
24   the normal ones that everybody uses.
```

Page 35

```
 1   Q.    Do you have an Instagram?
 2   A.    Not anymore.
 3   Q.    We've been going for almost an hour.
 4   Are you comfortable to continue, or do you
 5   want to take a short break?
 6   A.    I'm okay continuing.
 7   Q.    What types of activities did John
 8   Evanoff do prior to the March 2021 accident
 9   in terms of personal life?
10   A.    As far as in the home or like what
11   was he interested in?
12   Q.    I'll go through it.  So did he have
13   any hobbies?
14   A.    Yes.  John liked to play video
15   games, watch movies, like go to the movies.
16   We would go shopping, hang out with his
17   friends, go on vacations, out to dinners.
18   We were a family unit.  So typically it
19   wasn't just John.  It was almost always
20   like John, me and G_____, unless G_____
21   was with his grandmother.
22   Q.    When you say, "grandmother," are you
23   referring to your mother or John Evanoff's
24   mother?
```

Page 36

```
 1   A.    No.  My mother passed away when I
 2   was 16.  So it's John.  Any time that I say
 3   grandmother, that would be John's mother.
 4   Q.    Understood.  Do you still maintain
 5   contact with John Evanoff's parents?
 6   A.    John did not have a father.  But,
 7   yes, I still speak with Rose, his mother.
 8   Q.    I'm sorry.  What was the last part?
 9   A.    G_____ still goes to visit her and
10   things like that.  So I do still speak with
11   her.
12   Q.    Do you have any type of relationship
13   with John Evanoff's sisters?
14   A.    Yes.  They live in Ohio, so I don't
15   typically get to see them in person.  But
16   we do still speak to each other, yes.
17   Q.    How did John Evanoff help around the
18   house?
19   A.    He would -- we shared parenting
20   responsibilities.  He loved G_____.  So he
21   was all about being around G_____ all the
22   time.  That wasn't like -- we just would
23   both take care of G_____.  And then, like
24   I said, depending on if I was at work or he
```

Page 37

```
 1   was at work, it would just depend on who
 2   cooked, who cleaned.  Whatever needed to be
 3   done, we would share responsibilities as
 4   far as that was.  I did most of the
 5   cleaning, but he would definitely help.  He
 6   would help do laundry.  He always took out
 7   the trash.  I didn't really take out the
 8   trash.  Everything was pretty equal.  He
 9   mostly did trash by himself.  Otherwise, we
10   shared responsibilities depending on when
11   and what was going on working-wise.
12   Q.    Was the video games something that
13   John did on his own, or was that an
14   interest that you also had?
15   A.    I love video games, too, so does my
16   son.  We would all play video games
17   together.
18   Q.    Was John Evanoff diagnosed with any
19   medical conditions prior to March 2021?
20   A.    He was diagnosed with ADHD.  He
21   wasn't taking any medication for it,
22   though.  He didn't need it.  He always
23   functioned without any medications.
24   Q.    When was he diagnosed with ADHD?
```



```
                                          Page 38
 1        A.   He was probably a child, I would
 2   imagine.  I know in school, he had to take
 3   medication for it.  But after school, he
 4   stopped taking the medication and he was
 5   fine functioning at work and in the home
 6   without medication.  So he didn't take any.
 7        Q.   Did he have any other health
 8   conditions or limitations of any type?
 9        A.   No.
10        Q.   Did he have a primary care doctor?
11        A.   Yes.  I do not know the name of his
12   doctor.  I don't even remember where he
13   went to the doctor.
14        Q.   Had he ever been hospitalized prior
15   to March 2021?
16        A.   I do not recall.  As far as severe
17   injuries, I don't remember him having any
18   severe injuries or anything like that.
19        Q.   What about minor injuries?
20        A.   Like what do you mean?
21        Q.   It could be anything.  A broken
22   bone, a car accident?
23        A.   No broken bones.  We were in a car
24   accident, but I think all he did was just
```

```
                                          Page 39
 1   sprain -- I don't even remember what he
 2   sprained.  He just sprained something and
 3   it was fine in like a month.
 4        Q.   When was that car accident?
 5        A.   Oh, boy.  I do not recall.  It was
 6   very long before he worked at the factory.
 7   I know that.  Like it -- yeah, I can't even
 8   tell you a year.
 9        Q.   What happened in that car accident?
10   Were you with him at the time?
11        A.   Yes.  Oh, I do know the year,
12   because I had just had G█████ by
13   caesarean.  It was a week, the same week
14   that I had G█████, because I was concerned
15   about my incision.  I remember that.  So it
16   would have been in █████ 2015.
17             We were stopped at a stoplight in
18   Muhlenberg and we were rear-ended.  I got
19   hurt.  He was fine.
20        Q.   What type of vehicle were you in?
21        A.   It was -- I don't remember the year
22   of it.  It was a Chevy Sonic.
23        Q.   Is that a sedan?
24        A.   Yes.  We just got it.  It wasn't
```

```
                                          Page 40
 1   even a year old, I don't think.
 2        Q.   Was it totaled?
 3        A.   Yes.
 4        Q.   Did John Evanoff have any medical
 5   treatment in connection with that car
 6   accident?
 7        A.   I don't remember if he saw a doctor
 8   for anything related to that.  He was more
 9   concerned with if I was okay, because I was
10   in a lot of pain.
11        Q.   Did you go to the hospital after
12   that accident?
13        A.   I may have seen -- I don't remember
14   if I did.  I may have just seen my doctor
15   that delivered my son.  Like I said, I had
16   a caesarean.  So that was my -- the seat
17   belt hurt.  But other than that, I don't
18   think -- I don't remember if I went to like
19   a Patient First or anything like that.  I
20   may have only seen like my follow-up --
21   like I just had my son.  So I can't recall.
22        Q.   And just to make sure I understand
23   your testimony correctly, you had just
24   given birth to G█████, and then shortly
```

```
                                          Page 41
 1   after, this accident occurred?
 2        A.   It was in the same week that I had
 3   given birth to G█████, yes.
 4        Q.   Was it just you and John Evanoff in
 5   the vehicle at the time of the accident?
 6        A.   Yes.  G█████ was in the NICU for
 7   five months after he was born.  He was a
 8   micro preemie.  He was born at six months
 9   gestation, approximately, 26 weeks and some
10   days.  His sister was also born premature.
11        Q.   You are referring to your daughter?
12        A.   Yes.
13        Q.   Was John Evanoff wearing a seat belt
14   at the time of that accident?
15        A.   Yes.  He always -- we both always
16   wore our seat belts.  Safety is very
17   important.
18        Q.   Was John Evanoff a smoker?
19        A.   Yes.
20        Q.   Cigarettes?
21        A.   Yes.
22        Q.   Anything else?
23        A.   No.
24        Q.   Well, it could be cigars or
```

                                              11 (Pages 38 to 41)



Page 42

```
 1    something like that.
 2    A.    No.
 3    Q.    Just cigarettes?
 4    A.    Yes.
 5    Q.    And how many cigarettes a day would
 6    he smoke on average?
 7    A.    Approximately maybe ten.
 8    Q.    So about half a pack of cigarettes a
 9    day?
10    A.    Yes.
11    Q.    Do you smoke?
12    A.    Not anymore.
13    Q.    When did you quit?
14    A.    I don't know.  I don't have an exact
15    date.  It's been a while.
16    Q.    Was John Evanoff always a smoker
17    from the time that you met in high school
18    through March of 2021?
19    A.    Yes.
20    Q.    Did John Evanoff drink any alcohol?
21    A.    Very rarely.
22    Q.    Can you estimate the number of
23    drinks a week on average?
24    A.    It wasn't weekly.
```

Page 43

```
 1    Q.    Any drug use?
 2    A.    No, no.
 3    Q.    What about prescription medications?
 4    Was John Evanoff prescribed any
 5    medications?
 6    A.    Not that I recall.  I don't remember
 7    him taking anything daily.  Not even -- I
 8    don't think he even -- no, not even -- no.
 9    He didn't even take supplements for him
10    working out.
11    Q.    You mentioned working out.  Did he
12    go to the gym?  What are you referring to?
13    A.    He didn't go to a gym.  But he would
14    do like, you know, pushups or just little
15    things to try to stay healthy.
16    Q.    Do you know what his height and
17    weight were?
18    A.    He was 6'1".  His weight would
19    fluctuate, give or take 10 pounds.  I think
20    he was around maybe 240 pounds.
21    Q.    And was he in that weight range for
22    approximately how long prior to 2021?
23    A.    I don't really remember.  I was with
24    him for so long, it's blurry how much he
```

Page 44

```
 1    weighed when.  Yeah, I'm not certain.  John
 2    was always a large man.  He was what I
 3    call -- I call lovingly a manly man.  He
 4    was just a big guy, to me.  I'm small.
 5    Q.    Do you feel like he gained weight
 6    over the time that you met him or was he
 7    always a large man, as you describe him?
 8    A.    Yeah.  Because I met him when he was
 9    19, and then he became a grown man as I was
10    with him.  We were together a very long
11    time.  Well, to me what is a long time.
12    Q.    Would it be fair to say that maybe
13    the 2015 to 2021 time period, he was
14    approximately 230 to 240 pounds?
15    A.    Yes.
16    Q.    Did he have any doctors other than a
17    primary care physician?
18    A.    A dentist.  But I don't remember
19    where or who that was either.  It was a
20    small business.
21    Q.    Did he have any hospitalizations
22    that you can recall?
23    A.    Like admissions?
24    Q.    Going to the hospital for any
```

Page 45

```
 1    reason.
 2    A.    I don't remember him being -- having
 3    any hospital stays or anything like that,
 4    no.
 5    Q.    Do you recall any surgeries that he
 6    may have had?
 7    A.    No.
 8    Q.    Did he have any -- was he involved
 9    in any accidents other than that motor
10    vehicle accident you described earlier?
11    A.    No.
12    Q.    So we talked earlier that John
13    Evanoff began work at East Penn in or
14    around December of 2020.  At the time when
15    he was there, did he say anything to you
16    about his intentions to continue working at
17    the company or maybe a desire to change
18    jobs or go back to what he was doing
19    before?
20    A.    No.  He was very excited to work
21    there.  The pay rate was much higher than
22    his previous job.  So he was very happy
23    that he was going to be making more money.
24    Q.    Did he have any other claims related
```

12 (Pages 42 to 45)



Page 46

```
 1   to work injuries prior to March 2021?
 2   A.   Claims? I'm not certain. I know he
 3   had gotten burnt on his cheek. But I don't
 4   know if the nurse filed any -- he went to
 5   see the nurse about that. But I don't know
 6   if they filed any paperwork on it. I'm not
 7   certain.
 8   Q.   When you say that he had gotten
 9   burnt on his cheek, was that while working
10   at East Penn?
11   A.   Yes.
12   Q.   And when you said he went to see a
13   nurse, would that be a nurse working at
14   East Penn?
15   A.   Yes.
16   Q.   What was the extent of the burn?
17   A.   It was maybe like -- maybe an inch
18   long on his cheek here.
19   Q.   Okay. And you are pointing to your
20   right cheek?
21   A.   I don't remember which cheek. It
22   was near his eye-ish on his cheekbone area.
23   Hot lead had splashed up on his face.
24   Q.   Did he say anything to you about how
```

Page 47

```
 1   that incident occurred?
 2   A.   He said that there was lead stuck to
 3   something and when it detached and fell
 4   into the molten lead, then there was
 5   splash-up. I don't know exactly how
 6   everything works as far as that goes, but
 7   that's how he explained it to me.
 8   Q.   Did he describe his daily work
 9   activities to you?
10   A.   Yes. Not in great detail. But I
11   kind of knew what he did in general, if
12   that's what you mean.
13   Q.   Did he discuss any type of training
14   that he may have received at East Penn?
15   A.   I know he -- I don't know the
16   specifics of the training. I don't think
17   he was like -- I know he drove the
18   forklift, but he wasn't -- they didn't yet
19   give him the certification for it. But he
20   was required to drive it. They made him
21   drive it. So I know he did that. He only
22   just finished training, I think, when the
23   accident occurred, shortly before that. He
24   still worked -- his partner that he worked
```

Page 48

```
 1   with was his trainer as well. But for the
 2   most part, I think he -- I don't know
 3   about, like, certifications or anything
 4   like that. But he was trained to do the
 5   job that he was doing.
 6   Q.   And that training was provided by
 7   East Penn?
 8   A.   Yes.
 9   Q.   You mentioned a partner that he
10   worked with. Who were you referring to?
11   A.   I don't know the man's name. I
12   just -- well, I know his first name was
13   Josh. I don't know anything else.
14   Q.   Have you spoken with anyone at East
15   Penn since the March 2021 incident?
16   A.   As far as do you mean like -- well,
17   the night of the incident, I had spoken to
18   somebody when I called them to see if it
19   was John that was involved in the accident.
20   But other than that, no. And for his
21   memorial, a woman had reached out from HR,
22   I believe. But other than that, no. I
23   always went through my lawyers.
24   Q.   How did you come to learn of the
```

Page 49

```
 1   incident?
 2   A.   I was asleep on the couch waiting
 3   for him to come home. We were going to
 4   watch a movie together. G____ was at his
 5   grandmother's. Can I have just a moment,
 6   please?
 7   Q.   Yes. We will go off the record.
 8        (A brief recess was taken at
 9    this time.)
10   BY MR. LUONGO:
11   Q.   We're back on.
12   A.   I was asleep on the couch, and then
13   I woke up to a message from my nephew on
14   Facebook stating that there had been an
15   accident at East Penn Manufacturing. And
16   he wanted to know if John knew anything
17   about it, because it was in the smelting
18   building. And then I realized that John
19   wasn't home, so I called them.
20        It was like 2:30 in the morning or
21   something when I received the message. So
22   I called them to see where John was and if
23   he was still in the building. I thought
24   maybe he had been held up because of, you
```

13 (Pages 46 to 49)



```
                                        Page 50
 1   know, something happening in his building.
 2   Of course maybe they had to like traffic,
 3   or if there was an accident, maybe he had
 4   gotten hurt.  I didn't know exactly what
 5   the accident was.
 6         So I called them.  And then I don't
 7   know how many people I spoke to.  I know it
 8   was back and forth, and it was a mess.  But
 9   I did speak to some people that night.
10   They didn't actually -- they just said that
11   he was involved in an accident.  They
12   didn't tell me of his death.  They just
13   said some folks were going to come around
14   to talk to me.  I remember that was their
15   exact wording:  Some folks are going to
16   come around to talk to you then.
17         And then the coroner came to my
18   house and stuff and talked to me a few
19   hours later.
20   Q.    Is that the first person to come to
21   your home regarding this, the coroner?
22   A.    Yeah.  They came in a coroner marked
23   vehicle.
24   Q.    There was a memorial service for
```

```
                                        Page 51
 1   John Evanoff, correct?
 2   A.    You mean did I have a memorial
 3   service or did the company have a memorial
 4   service?
 5   Q.    Sorry.  One moment.  Did you have a
 6   memorial service for John Evanoff?
 7   A.    Yes, I did.
 8   Q.    Is that the Theo C. Auman Funeral
 9   Home in Reading, Pennsylvania?
10   A.    Yes.
11   Q.    Did you set up any type of GoFundMe
12   for John Evanoff?  Excuse me.  Let me
13   rephrase that.
14         Did you set up any GoFundMe relating
15   to your memorial service for John Evanoff?
16   A.    I did not.  His sisters, or sister,
17   I believe, did.
18   Q.    And did you receive any funds from
19   setting that up?
20         MS. WEISS:  Objection to the
21      form.
22         You can answer.
23         THE WITNESS:  What's that?
24         MS. WEISS:  You can answer.
```

```
                                        Page 52
 1      I just objected.  But you can answer
 2      the question.
 3         THE WITNESS:  Okay.  Yes, I
 4      did.
 5   BY MR. LUONGO:
 6   Q.    I'm going to pull up another exhibit
 7   that will be marked.  Ms. Evanoff, I'm
 8   showing you a document that will be marked
 9   as Exhibit Evanoff-2.  It's a screenshot of
10   a GoFundMe page set up in connection with
11   John Evanoff.  Is this a photo of you, John
12   Evanoff and G█████ in this exhibit?
13   A.    Yes.
14   Q.    If you look to the right side,
15   there's a donation goal.  Do you see that?
16   A.    Yes.
17   Q.    And the $28,916, who did that go to?
18   A.    Me.
19   Q.    Did that cover funeral expenses?
20   A.    Yes.
21   Q.    And were there funds left over after
22   paying for the funeral expenses?
23   A.    Yes.
24   Q.    Do you have any plans to return to
```

```
                                        Page 53
 1   work?
 2   A.    Probably some day.  Not in the near
 3   future.
 4   Q.    When your daughter begins school,
 5   have you given any thought as to whether or
 6   not you would go back to work at that time?
 7   A.    No.  Well, I haven't thought about
 8   it.  Not really.  Maybe.
 9   Q.    Have you made any efforts currently
10   to look for employment?
11   A.    No.
12         MS. WEISS:  Do you want to
13      take a break for a few minutes,
14      Victoria?
15         THE WITNESS:  Yes, please.
16         MR. LUONGO:  Let's go off the
17      record.
18         (At this time, a short break
19      was taken.)
20   BY MR. LUONGO:
21   Q.    I only have a few follow-up
22   questions for you.
23         Earlier in the deposition I asked
24   about social media websites, and you
```

14 (Pages 50 to 53)



Page 54

```
 1  mentioned Facebook, Snapchat, Tiktok.  Do
 2  you have any special usernames on those
 3  accounts?
 4  A.    First I wanted to ask, is Gabrielle
 5  here?
 6          MS. WEISS:  I'm here.
 7          THE WITNESS:  Okay.  I'm
 8     trying to remember what they are.
 9     My Facebook account is my name,
10     Victoria Evanoff.  And then my
11     Tiktok account -- what's the name?
12     I don't recall what the name is.
13     It's under my name, but I don't
14     know -- I can't remember what the
15     username is.  And my Snapchat also
16     shows up under my name.  I don't
17     remember what the username is.
18  BY MR. LUONGO:
19  Q.    Is Mr. Deblasi currently in a
20  relationship?
21  A.    I'm not certain.  I don't believe
22  so.
23  Q.    Is he close with your daughter, his
24  daughter?
```

Page 55

```
 1  A.    He sees her every day since he lives
 2  here and she lives here.
 3  Q.    Does he assist with taking care of
 4  her?
 5  A.    Not particularly.
 6  Q.    Do you speak with him on a daily
 7  basis?
 8  A.    In passing, like if we happen to be
 9  in the same room.
10  Q.    Did your relationship with him
11  change since the time that you bought your
12  current home?  In other words, were you
13  together when you bought the house?
14  A.    Yes.
15  Q.    So you were in a relationship with
16  Mr. Deblasi when you purchased the home?
17  A.    Yes.
18  Q.    But at a later date, you split up
19  with him?
20  A.    Yes.
21  Q.    What is the ownership interest of
22  the house between you and Mr. Deblasi?
23  A.    What do you mean?
24  Q.    In terms of percentage, is it split
```

Page 56

```
 1  equally or is it some other distribution?
 2  A.    I believe so.
 3  Q.    You believe that it's split equally
 4  between you and Mr. Deblasi?
 5  A.    Legally, yes.  Financially, I've
 6  always paid everything.
 7  Q.    What is the monthly mortgage
 8  payment?
 9  A.    Approximately $2,100.  I have
10  everything on automatic out of my bank
11  account.  But I believe that's what it is.
12  Q.    And then in addition to that, do you
13  pay electricity and utilities separate?
14  A.    Yes.  I pay -- I have water, trash,
15  sewer, and I have electric and I have gas,
16  and then the taxes are in with the
17  mortgage.
18  Q.    Is this a single-family home as
19  opposed to a house that's connected to
20  other homes?
21  A.    Single family.
22  Q.    Is G[____] involved in any school
23  activities or after-school activities
24  today?
```

Page 57

```
 1  A.    Do you mean is he at school?
 2  Q.    Well, I understand that he's in
 3  third grade.  Does he do any after-school
 4  activities?
 5  A.    No, he doesn't.  He's not
 6  interested.  I've tried to get him in to
 7  science.  He's very interested in science.
 8  But he doesn't attend any after-school
 9  programs.
10  Q.    Is he playing any sports or anything
11  of that nature?
12  A.    Oh, no.  G[____] doesn't like
13  contact sports.  He doesn't -- he's not a
14  sporty boy.  He likes more like art and
15  music.  He really likes -- his favorite
16  thing he said is recess.
17  Q.    What does he like about that?
18  A.    Recess?  He's a social butterfly.
19  He loves playing with friends.
20  Q.    So does he bring friends home after
21  school?
22  A.    No.  He just has school friends,
23  really.  He doesn't -- he doesn't have
24  anybody that comes over yet.
```

15 (Pages 54 to 57)



Page 58

1  Q.  Would you describe him as an
2  outgoing personality?
3  A.  Yeah.  He's very friendly.  He's
4  very compassionate, a very kind boy.
5  Q.  Does he help take care of his half
6  sister?
7  A.  Yes.  He loves -- oh, he loves her.
8  He loves her so much.  They are funny.
9  Q.  I am just looking over my notes to
10  see if I have anything else.
11     You mentioned the workplace incident
12  where John had a burn on his cheek.  Do you
13  recall that testimony?
14  A.  I do.
15  Q.  Did he mention any concerns to you
16  about working at East Penn, or was he happy
17  to be there?
18  A.  As far as concerns, the only concern
19  that he had was his respirator, really.  He
20  did say it was like -- the area that he
21  worked in was like a really busy, bustling
22  area, I guess as far as like people moving
23  around and stuff.  But he was happy to be
24  working there, so he wasn't -- he didn't

Page 59

1  want to leave East Penn or anything like
2  that.  But, you know, you are working with
3  hot lead.  It's hot.  He had mentioned that
4  it was hot in the building that he worked
5  in.  He only worked there a short time, so
6  he was happy to be making more money.  He
7  was happy I was going to be able to be a
8  stay-at-home mom.  We were looking forward
9  to the future.
10  Q.  Did you ever go to East Penn prior
11  to the March 2021 incident?
12  A.  I actually had applied there before,
13  but I wasn't hired.  I had been there for
14  an interview.  That's it.  I don't remember
15  when, though.
16  Q.  What was the position that you
17  interviewed for?
18  A.  I don't recall what the position
19  exactly was named as.  I think it had
20  something to do probably, like, battery
21  assembly.
22  Q.  Was it a position to be working on
23  the floor of the plant or some other front
24  desk type role?

Page 60

1  A.  No, it was not a desk.  It would
2  have been like on the floor.
3  Q.  And I believe that you mentioned
4  earlier that a friend had mentioned that
5  East Penn was looking to hire.  Did you
6  interview based on the person making that
7  statement to you, or was this before John
8  Evanoff applied?
9  A.  It was before John applied for his
10  position, much, much before he applied.  It
11  was a different person that had -- the
12  person that told me about the position that
13  I interviewed for was a totally different
14  person than who the person that told him.
15  Mine was my own friend that had told me.
16  Q.  Did you ever mention East Penn to
17  John Evanoff as a potential employment
18  opportunity?
19  A.  Not particularly.  I mean, East Penn
20  is one of the largest factories in our
21  area, so it's kind of like common knowledge
22  that that's like one of the places to work
23  if you want to make good money.  So a lot
24  of people work there in this area.

Page 61

1  Q.  Did you and John Evanoff have a
2  social circle of friends, or did you mostly
3  spend time together between the two of you?
4  A.  I don't have many friends myself.
5  We shared most of our friends.  He did have
6  some friends that I didn't really know,
7  more so associates, I guess.  John was very
8  popular in high school.  I was more of an
9  introvert.  So he had many, many, I guess
10  you could call them acquaintances more so
11  than friends.  But our close-knit friends
12  circle were our friends.  We were with each
13  other constantly.
14  Q.  Do you still maintain contact with
15  those friends?
16  A.  I don't really talk to any of the
17  friends, no, that he had then before the
18  accident.  I don't, no.
19     MR. LUONGO:  Thank you for
20  your time today, Ms. Evanoff.  I
21  don't have any other questions.
22  I'll turn it over to your counsel if
23  she does.  But I appreciate your
24  taking the time this morning.  I

16 (Pages 58 to 61)

MAGNA
LEGAL SERVICES

```
                                                    Page 62
 1        know it was -- we had to talk about
 2        some emotional issues, so I
 3        appreciate that.  Thank you.
 4             THE WITNESS:  Thank you.
 5   BY MS. WEISS:
 6   Q.   I just have a few questions for you.
 7   Do you recall today talking about whether
 8   Mr. Deblasi contributed financially towards
 9   the home that you currently live in?
10   A.   Yes.
11   Q.   Does Mr. Deblasi contribute to any
12   of the utilities, water, trash, sewer,
13   electric or gas?
14   A.   No.
15   Q.   Does he pay anything towards the
16   taxes on the house?
17   A.   No.
18   Q.   Does he pay you any type of rent?
19   A.   No.
20   Q.   Does he pay any type of child
21   support?
22   A.   No.
23            MS. WEISS:  I have no further
24        questions.  Thank you, Victoria.
```

```
                                                    Page 63
 1   BY MR. LUONGO:
 2   Q.   I have a couple follow-up.  On the
 3   child support, is that something that
 4   you've requested him to assist with?
 5   A.   I did request it, yes.  I did not
 6   follow through.
 7   Q.   What was his response on
 8   contributing to all these things, the
 9   utilities, the taxes, rent and the child
10   support?
11   A.   I didn't -- I never really asked him
12   for any money to stay here.  I want him to
13   be able to save his money so that he can
14   live on his own at some point.  So he's
15   just been saving money so that he can get
16   his own place separate from this home.
17   Q.   I apologize if I asked this earlier.
18   But what is he currently doing for work?
19   A.   I'm not certain of his job title.
20   He works in a factory, Keurig Dr. Pepper.
21            MR. LUONGO:  That's right.
22        Okay.  Thank you, Ms. Evanoff.
23            (Deposition concluded at
24        12:03 p.m.)
```

```
                                                    Page 64
 1            (At this time, documents were
 2        marked for identification as Exhibit
 3        Nos. Evanoff-1 and Evanoff-2.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                    Page 65
 1                 C E R T I F I C A T E
 2
 3        I, KRISTIN N. McCUSKER, Registered Merit
 4   Reporter, Certified Realtime Reporter and Notary Public,
 5   do hereby certify that the foregoing is a true and
 6   accurate transcript of the stenographic notes taken by me
 7   in the aforementioned matter.
 8
 9
10
11                       - - -
12
13
14
15
16
17
18
19   DATE:  _____
20         Kristin N. McCusker, RPR, RMR, CRR,
           Notary Public
21
22
23
24
```

17 (Pages 62 to 65)

